284 So.2d 124 (1973)
Rayford AGUILLARD, Plaintiff and Appellee,
v.
LAKE CHARLES STEVEDORES, INC., Defendant and Appellant.
No. 4291.
Court of Appeal of Louisiana, Third Circuit.
September 18, 1973.
Rehearing Denied November 2, 1973.
Writ Refused December 19, 1973.
Holt & Woodley, by Meredith T. Holt, Lake Charles, for defendant and appellant.
Raleigh Newman, Lake Charles, for plaintiff and appellee.
Before FRUGÉ, SAVOY and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
Plaintiff, who was employed by defendant as a crane operator, sustained a disabiling injury resulting from an on-the-job accident which occurred on February 25, 1970. On that date he was engaged in testing the hold of a ship for gases when he slipped and fell some sixteen to twenty feet, crushing his left ankle. The ankle never healed properly and after three unsuccessful surgical procedures it appears that an amputation thereof will probably be necessary.
Defendant continued to pay plaintiff his full wages, $174.00 per week including $70.00 per week in Longshoremen's and Habor Worker's Compensation payments, and afforded him all medical and insurance benefits available to its employees until May 21, 1971. On that date defendant discharged plaintiff due to an economic depression that it was then experiencing, and to the opinion of its officers that plaintiff had failed to demonstrate an attitude of interest in and loyalty to his employer.
Alleging that defendant had no right to discharge him and terminate his benefits, *125 plaintiff filed suit against it seeking the return of his weekly pay and employment benefits. Trial was had in the District Court before a jury and a verdict was returned in favor of plaintiff. Judgment was rendered in accordance therewith ordering defendant to pay to plaintiff the sum of $13,520.00 and to furnish him with hospitalization and life insurance policies providing the same benefits as he had while in the employ of defendant, such policies to remain in effect through November 20, 1973. Defendant appealed to this court.
The basis of the dispute revolves around the terms under which plaintiff was employed by defendant. At the time of his employment an oral contract was entered into whereby he was guaranteed forty hours of work per week plus hospitalization and life insurance at the company's expense, and paid vacations. Plaintiff interprets those terms as meaning that he would be paid for forty hours of work each week while unable to work due to a physical infirmity, and under a physician's care, for an unlimited length of time. Defendant, on the other hand, contends that no such guarantee of unlimited sick leave at full pay was ever intended or offered to plaintiff, and that it had the right to terminate his employment at any time that such should be warranted. Also in dispute is the question of whether plaintiff's discharge was warranted, even under defendant's interpretation of the employment contract.
The evidence shows that plaintiff had been hired nearly ten years earlier as a crane operator, by Walter B. Austin, Jr., Vice-President and General Manager of the defendant corporation, and T. E. Lundy, defendant's general superintendent. Besides the operation of cranes, his duties included testing for gases in the holds of ships, welding, and truck driving. Thus if at any given time there was no work available in his primary field of crane operation, plaintiff was expected to work in one of the other areas mentioned to earn his forty hours of weekly pay. Nevertheless it was shown to be the practice of defendant to pay such employees as had been given this forty hour guarantee their full wages, minus the amount paid them under the Longshoremen and Habor Workers Compensation Act, whenever they were absent from work due to injury or illness, until such time as they were able to return to work.
In this connection, four of plaintiff's fellow employees testified that it was their understanding that should they become injured or ill they would be paid their full wages and would retain their other employment benefits for so long as they remained under a physician's care and were unable to return to work. Their testimony further shows that a number of defendant's employees were off work due to such causes and were paid their full salary for several months.
In opposition to the foregoing, defendant presented, besides that of Austin and Lundy, the testimony of James C. Hickman, the head crane operator. He testified that he understood the forty hour per week guarantee to mean that he would be paid for that number of hours each week for as long as he was able to work. He professed to know nothing of any sick leave benefits and did not think that any employee of defendant was entitled to unlimited sick pay.
Plaintiff testified that at the time that he was hired both Austin and Lundy assured him of unlimited sick pay. He cited the case of one Lee Richardson, another employee of defendant, who was unable to work for some two or three years and received his forty hours per week pay for the entire time of his absence. Plaintiff himself had missed work before because of sprained ankles and a ruptured appendix, and he had been paid during his absence.
Austin and Lundy, while they insisted that no employee, including plaintiff, had ever been offered unlimited sickpay, did *126 not deny that others had been paid for several months' absence. On cross-examination Austin admitted that no other employee had ever been discharged while unable to work and under a physician's care. Both of these gentlemen asserted, however, that plaintiff had failed to show the proper attitude toward the company.
They pointed out that during his absence from work plaintiff had engaged in such activities as hunting, fishing, and attending horse races, while making no effort to return to work. Plaintiff went to the defendant's premises each Friday to pick up his pay check and when doing so drove his own standard transmission pick-up truck. Lundy said that he therefore asked plaintiff to return to light duty driving such a truck on errands for the company. Plaintiff engaged in this activity for a couple of days and then ceased working again. Accordingly Lundy and Austin adopted the view that plaintiff was demonstrating a lack of interest in his work and lack of loyalty to his employer. Because of this and because of the economic slump that defendant was experiencing at the time, they discharged him.
Plaintiff explained that the truck driving incident referred to was the only time that he was offered light duty by defendant and that had other forms of work that he could handle been offered, he would have tried them. He said that on the occasion that he drove the defendant's truck he ceased working because of the pain that it caused him, and that he in fact had to return to the hospital immediately after attempting that work for the removal of some screws that had become infected in his ankle. Plaintiff went on to explain that he was able to drive his own pick-up truck because the carburetor thereon had been advanced, an alteration which enabled him to drive it without the use of his left foot. He stated that on those occasions when he went hunting, fishing or to the horse races he did nothing but sit and he was therefore able to tolerate such activities. At the time he was discharged he felt unable to perform any of the duties for which he had been hired.
On cross-examination both Austin and Lundy admitted that so far as they knew plaintiff had been offered light duty only once and that he had attempted it. That, of course, was the occasion on which he was asked to run errands in the pick-up truck.
The two physicians who testified, Dr. Edward W. Phillips, Jr. and Dr. Norman P. Morin, both orthopaedic surgeons, were not in total agreement regarding the necessity of amputating plaintiff's left ankle. Dr. Rufus Alldredge, a specialist in amputations from New Orleans, who also examined plaintiff but did not testify, had recommended that plaintiff's left ankle be amputated. Dr. Morin agreed with the recommendation whereas Dr. Phillips opined that amputation could possibly be avoided if plaintiff could tolerate the pain in his ankle. Both Dr. Phillips and Dr. Morin agreed, however, that plaintiff was totally and permanently disabled from performing the type of work that he had engaged in prior to the accident. Dr. Phillips stated that plaintiff could reach a point of maximum cure within three to six months after an amputation whereas Dr. Morin felt it would take six to eight months. Both agreed that such a procedure would require a two-week period of hospitalization.
With this evidence before it the jury concluded that defendant had no right to terminate plaintiff on May 21, 1971, and that it should continue his sick pay and benefits until November 20, 1973, a period slightly in excess of eight months from the date of trial. That verdict was obviously based on a factual finding that plaintiff's version of the employment contract was correct or that he had given defendant no cause to terminate him at the time that it did. In either case the verdict is amply supported by the evidence and is certainly free of manifest error, hence we are precluded from disturbing it. The termination date of November 20, 1973, set by the jury is supported by Dr. Morin's testimony relative *127 to the length of time required for maximum cure after an amputation of the sort indicated in plaintiff's case.
Defendant complains of the trial judge's refusal to give all of the charges and interrogatories requested by it. This contention was well answered by the trial judge when he stated that the object of instructions to the jury is not to give it all of the law available on the subject matter involved, but rather all of the law that is pertinent to the case at bar, in terms that the jury can comprehend and apply to the evidence before it. We have carefully read the charges given to the jury and find that they adequately meet this criterion.
For the above and foregoing reasons the judgment of the District Court is affirmed at the costs of defendant-appellant in both courts.
Affirmed.